JAMES J. WARD AND BETTY WARD, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Ward v. Commissioner
Docket Nos. 35071-83, 35072-83.
United States Tax Court
T.C. Memo 1987-215; 1987 Tax Ct. Memo LEXIS 208; 53 T.C.M. (CCH) 685; T.C.M. (RIA) 87215; April 28, 1987. *208 Held: Petitioners James J. and Betty Ward's charter boat activity was not engaged in for profit. Held further, petitioners James J. and Betty Ward are not entitled to an investment tax credit with respect to their charter boat. Held further, the amount distributed by Ward Mining to James J. Ward for the downpayment on the boat is a dividend. Held further, Ward Mining is not entitled to a business entertainment deduction for amounts paid to charter the Wards' boat. Fred Wood and Fred Daniels, for the petitioners. Roslyn Taylor, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: On September 20, 1983, respondent determined deficiencies in petitioners James J. and Betty Ward's Federal income tax in the amounts of $8,411, $10,060, and $12,574, for the calendar years 1978, 1979, and 1980, respectively, and a deficiency in petitioner J.J. Ward Mining and Industrial Equipment, Inc.'s (Ward Mining) Federal income tax for its fiscal year ended March 31, 1980, in the amount of $521. After concessions the issues remaining for decision are: (1) Whether petitioners James J. and Betty Ward's charter boat activity was an "activity not engaged in for profit" *209 within the meaning of section 183[2]; (2) whether petitioners James J. and Betty Ward are entitled to an investment tax credit for their charter boat; (3) whether the amount distributed to James J. Ward by Ward Mining for the downpayment on the charter boat is properly characterized as repayment of a loan or a dividend; and (4) whether Ward Mining is entitled to a business entertainment deduction for the amounts paid as fees for chartering the Wards' boat. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners James J. and Betty Ward, husband and wife, resided in Birmingham, Alabama, at the time the petition in docket Number 35071-83 was filed. Petitioner Ward Mining is a corporation whose principal office was in Birmingham, Alabama, at the time the petition in docket Number 35072-83 was filed. Background Information on Corporation
Mr. and Mrs. Ward acquired Ward Mining, an existing manufacturer's representative business, in 1962. They operated the business *210 in noncorporate form until April 1, 1972, when they incorporated it. At that time cash and certain assets of the business were transferred to the corporation. The assets were transferred pursuant to a Bill of Sale dated April 3, 1972, which provides in pertinent part: FOR VALUE RECEIVED, the undersigned J. J. Ward, does hereby grant, bargain, sell, transfer, convey, set over and deliver to J.J. Ward Mining & Industrial Equipment, Inc., the following described personal property located and situated at 4124 - 2nd Avenue, South, in Birmingham, Jefferson County, Alabama, towit: 1. 1971 Dodge pick-up truck. 2. 1970 Buick Skylark automobile. 3. 1972 Buick Skylark automobile. 4. 1972 Buick Centurion automobile. 5. 25 foot all glass boat. 6. All inventory of all kind and character heretofore used by the undersigned in business known as J.J. Ward Business & Equipment Company, Inc.
7. All furniture, fixtures and equipment used at the premises in connection with the said business located at 4124 - 2nd Avenue, South, Birmingham, Alabama. 8. All cash in the name of J.J. Ward, d/b/a J.J. Ward Business & Equipment Company, Inc., in the City National Bank of Birmingham, in the approximate *211 amount of $30,000.00. TO HAVE AND TO HOLD to the said J.J. Ward Mining and Industrial Equipment, Inc., its successors and assigns forever. At all times relevant hereto, Mr. Ward was president of and owned 60 percent of the stock of the corporation and Mrs. Ward owned 40 percent of the stock. The corporation adopted a fiscal year beginning April 1 and ending March 31. On its Federal income tax return for the taxable year ended March 31, 1973, the corporation's balance sheet reflected common stock with a par value of $10,000, and a $40,000 loan from stockholders. No note to evidence a loan to the corporation was executed at this time, and the corporation never paid any interest on the loan. In 1974, respondent audited the corporation's tax return for its fiscal year ended March 31, 1973. As a result of the audit, Mr. Ward, in his capacity as president of the corporation, executed a Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax, consenting to the assessment and collection of a deficiency in the amount of $11,231.83. The Form 870 Waiver simply stated the amount of the agreed deficiency, and did not explain respondent's adjustments. However, a separate *212 report prepared by the revenue agent provided the following explanation: Gross Receipts
$56,819.35
Cost of Goods Sold
-3,150.83
Bonuses
-30,780.51
Insurance - Pension
Plan
11,251.88
Sales promotion
207.96
Office Supplies
2,003.25
Depreciation
-635.53
Taxes
147.24
Travel
685.57
Interest
83.71
Adjustments to Income
$36,632.09
The revenue agent's report also included the following explanation (presumedly of the consequences of corporate formation): Assets transferred to the Corp: Cost or adjusted basis
1971 Dodge Truck
$2,124.78
1970 Buick Skylark
1,968.81
1972 Buick Skylark
3,799.49
25 foot all glass boat
5,416.72
Inventory
10,500.00
Furniture and fixtures
391.31
Cash - City National Bank
35,292.94
Cottage
8,602.86
Total
$68,096.91
Liabilities assumed: Accounts payable
9,054.79
Cottage mortgage
6,027.24
Total
15,082.03
Contributed capital
[3] 43,014.88
Capital stock
10,000.00
[4] *213 $68,096.91
Basis of capital stock received
by James J. and Betty Ward: Adjusted basis of assets
transferred
[5] $68,096.91
Liabilities assumed by the corp.
15,082.03
$53,014.88 Ward Mining's corporate returns for the fiscal years March 31, 1973, through March 31, 1978, were not produced at trial. On its tax return for the fiscal year ended March 31, 1979, the corporation reported loans from stockholders in the amount of $12,916. For the year ended March 31, 1980, the corporation's tax return reflects no outstanding loans from stockholders. The corporation's unaudited general ledger for the calendar years 1976 to 1978 reflect outstanding loans by shareholders in the following amounts: December 1976
$14,115.88
December 1977
14,115.88
December 1978
12,915.88
The Fishing Boats
In June 1977, the corporation purchased the fishing boat "Gold Nugget" at a cost of $30,534. The corporation used the boat, captained by Mr. Ward, to entertain clients and deducted certain expenses in connection with such use. In 1978 the corporation decided to retire the Gold Nugget and purchase a newer boat which would require less maintenance. The Board of Directors held a special meeting on April 11, 1978, and discussed the concerns that led to this decision: Board discussed expenses of operating the "Gold *214 Nugget" and all agreed maintenance and repair cost exceeded our budget; and all present felt we should trade this boat for a new one. Other than high maintenance and costly repairs the down time greatly hindered our entertainment schedule. Having customers fly into Florida only to find boat out of order. On several occasions it has been necessary to charter a boat which is not satisfactory. Mr. Ward also does many of the repairs, and cannot be away from the office for these additional duties. Mr. Ward reminded the members that this fishing boat has proved to be our best sales tool and more sales of mining equipment and parts resulted from these fishing trips than anything else. Records indicate business has grown considerably due solely to this particular entertainment, and Mr. Ward feels it will continue. He reminded the board that the officials of Ward Mining forego many yearly mining conventions and meetings, namely A.I.M.E. meetings, Coal's Show, and other related conventions, to appropriate additional entertainment funds. It was agreed that Ward Mining would not support the A.I.M.E. annual meeting in New Orleans. This additional expense would be appropriated for boat *215 expense. The Board noted to place bids out for a new boat of similar description comparable to the "Gold Nugget", preferably a 35' Bertram. Meanwhile, the "Gold Nugget" must be repaired and kept in working order. All items were voted and agreed upon by each member of the Board of Directors. On October 12, 1978, the Board discussed again the replacement of the Gold Nugget. It was agreed that the Gold Nugget would be retired and a 35-foot Bertram boat would be purchased. The new boat was scheduled to be delivered November 27, 1978. In 1978 [6], however, the Wards' accountant advised that after December 31, 1978, the corporation could no longer deduct expenses incurred in connection with an entertainment facility due to changes in the Tax Reform Act of 1978. On November 30, 1978, a special meeting of the Board was called regarding the purchase of the new Bertram boat. The minutes of the meeting provide: Discussed was the purchase of the new Bertram Boat. This will be leased by the company. Money owed to Mr. Ward from the company will be applied against this purchase, as downpayment on loan, and the balance of $98,696.76 will be loaned by the Company to be repaid without interest. *216 The first payment will begin in thirteen months. On that same day, using $12,916 he received from the corporation for the downpayment, Mr. Ward purchased the 35-foot Bertram fishing boat "Miss Betty" at a total cost of $111,431. The corporation advanced the remaining portion of the purchase price, totaling $98,696.76, to Mr. Ward for which he signed a "Loan Note" promising to begin repaying said amount in one year with interest to accrue at the rate of 12 percent on unpaid balance, to balloon with final payment. When Mr. Ward purchased the boat he was still working full-time, 5 days a week at Ward Mining. He planned to operate the boat on a part-time basis during the fishing season until he retired from Ward Mining, at which time he hoped to charter the boat on a full-time basis during the season. He believed, based on his experience operating prior boats and his discussions with skippers on other boats, that he could make a profit running the charter boat. He did not, however, attempt to estimate his income and expenses to determine whether a profit was realistic. Mr. Ward *217 maintained the "Miss Betty" in Destin, Florida, during the years in question. Shortly after the boat was delivered he placed a 17" X 27" sign on the boat which listed his phone numbers and advertised the boat for charter. He docked "Miss Betty" at the Reveille Motel, which was owned by Ken Beaird who also owned a charter boat. Initially Mr. Beaird agreed to act as representative of the "Miss Betty," [7] but Mr. Ward later terminated this arrangement when Mr. Beaird used the boat without his knowledge. During the 1978 and 1979 fishing seasons Mr. Ward charged $250 or $350 per day to charter the boat depending on whether he took the boat out onshore or offshore. Other than on one occasion the boat was always chartered to Ward Mining for its clients. Mr. Ward did not use the boat for personal purposes although he is a sports fisherman *218 and boat enthusiast. He was not a licensed captain, and when he chartered the boat he was required to take someone on board who was licensed. Consequently, when he ran the boat he hired a deckhand who also had a captain's license. In addition Mr. Ward did the majority of maintenance on the boat. A log was kept which reflects the dates the boat was used and the names of guests. No indication of the business relationship of guests or any business discussions is given in the log. [8] Based on entries in the log, the boat was taken out on 59 days in 1979 and 56 days in 1980 between the months of April and November. [9] Approximately 75 percent of those charters occurred on a Friday, Saturday, or Sunday. Mr. and Mrs. Ward filed joint income tax returns for the years 1979 through 1983. They reported net losses from the charter activity of $19,112, $17,569, $10,068, and $8,665 in 1979, 1980, 1981, and 1983, respectively. In 1982 they reported a net profit of $553. [10]
Respondent disallowed the Wards' losses in connection *219 with the charter activity during the years in issue to the extent the deductions exceed the income from the activity received in each year. Respondent also disallowed any investment tax credit claimed in connection with the boat. In addition respondent determined that the $12,916 Mr. Ward received from the corporation to pay the downpayment on the boat is a dividend rather than repayment of a loan as Mr. Ward alleges, and that the entertainment expense deduction Ward Mining claimed for amounts paid to Mr. Ward to charter the "Miss Betty" should not be allowed pursuant to section 274. OPINION Issues 1 and 2
Generally section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. However, section 183 limits the availability of these deductions if the activity is not engaged in for profit to deductions that are allowed regardless of the existence of a profit motive and deductions for ordinary and necessary expenses to the extent of the gross income derived from such activity. Sec. 183(b). [11] *220 Whether the Wards' charter activity was engaged in for profit depends on whether they engaged in the activity with an actual and honest objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dean v. Commissioner,83 T.C. 56, 74 (1984). The Wards' expectation of profit need not have been a reasonable one, but must have been bona fide. Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981). Profit objective is a question of fact to be determined from all of the facts and circumstances. Allen v. Commissioner,72 T.C. 28, 34 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Respondent's regulations set forth nine relevant factors to be considered in determining whether an activity is engaged in for profit. Sec. 1.183-2(b), Income Tax Regs.[12] In deciding whether the requisite profit objective exists in any case, *221 the presence of one, or even a majority of these factors is not determinative. Golanty v. Commissioner,supra;Benz v. Commissioner,63 T.C. 375 (1974). The burden of proof is on petitioners, Golanty v. Commissioner,supra at 426, with greater weight given to objective facts than to petitioners' mere statement of intent. Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,supra;sec. 1.183-2(a), Income Tax Regs.
After reviewing the entire record we conclude that the Wards have not proven that they operated their charter boat "Miss Betty" with the requisite profit *222 motive. We are unimpressed by the few outward manifestations of a business upon which the Wards base their position. See, e.g., Dunn v. Commissioner,supra.The Wards made little effort to charter the boat to anyone other than their wholly owned corporation during the years in issue, [13] and have failed to convince us that they purchased the boat with any objective other than to obtain the tax deductions no longer available to the corporation. [14]
No attempt was made to analyze the costs, risks, and returns of running the charter boat or to calculate a break-even point based on expected revenue and expenses. [15] Instead Mr. Ward testified that he assumed, based on personal experience and conversations with other skippers, that he could expect a profit. [16] A calculation of depreciation and fixed expenses alone would have demonstrated to Mr. Ward that he needed to charter the boat at offshore rates [17] a minimum of 75 days in 1979 and 59 days in *223 1980 simply to offset these expenses. [18] *224 This calculation does not include variable expenses, which were in excess of $10,000 in each year. We simply do not see how Mr. Ward could honestly have expected to make a profit chartering the "Miss Betty" while he continued to work full time at Ward Mining. [19] Thus we sustain respondent's determination on this issue. In addition, for the same reasons we hold that the activity does *225 not rise to the level that would entitle the Wards to an investment tax credit on the charter boat. Sections 38(a); 48(a)(1)(A); 167(a). See Flowers v. Commissioner,80 T.C. 914, 931 (1983); Pike v. Commissioner,78 T.C. 822, 841 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). Issue 3
Respondent determined that the $12,916 distribution by Ward Mining to Mr. Ward for the downpayment on the "Miss Betty" was a dividend and should have been included in the Wards' income in 1978. Mr. Ward contends that the amount was repayment of a loan and therefore is not includable in income. He contends that upon forming the corporation, the amount of capital he exchanged in excess of the par value of the stock he received was a loan to the corporation, and that the $12,916 paid for the downpayment on the boat was the corporation's final payment on that loan. Whether the distribution should be treated as repayment of a loan or a dividend thus depends on the characterization of the amount contributed to the corporation on formation as debt or as a contribution to capital. A variety of factors may be relied upon to determine whether debt or equity exists for tax purposes. See, *226 e.g., Estate of Mixon v. United States,464 F.2d 394 (5th Cir. 1972). [20] The factors are not of equal significance and no one factor is controlling. Estate of Mixon v. United States,supra.The burden of proof is on petitioners to show respondent's determination is incorrect. Rule 142(a). As would be expected, each party has *227 urged us to consider the factors which weigh in favor of their respective positions. Respondent emphasizes that no instrument existed to evidence the corporation's indebtedness, no interest was paid by the corporation, and no fixed maturity date existed. Respondent also argues that Mr. Ward had no enforceable right to repayment of the amounts as principal or interest. In contrast, arguing that the amounts paid into the corporation on formation were consistently treated as a loan on the corporation's books and tax returns and that the loan was repaid in full in a relatively short period of time, Mr. Ward contends that the lack of formality surrounding the transaction should not be fatal. He emphasizes that the corporation was not thinly capitalized, repayment was not dependent on corporate earnings, and that respondent has not claimed that the loan was subordinate to other creditors or contributions or that the corporation could not have obtained a loan from an outside source. Considering all of the evidence we conclude that petitioners have failed to prove that the amount advanced to the corporation was anything other than a contribution to capital. Although a valid debt may exist *228 without formal instruments, we are not convinced that such was the case here. The factors alleged by petitioners, such as financial reporting and bookkeeping do not prove anything more than do their statements of intent absent any accompanying objective economic indicia of debt. See, e.g., Gilbert v. Commissioner,74 T.C. 60 (1980). The essential difference between lenders and holders of equity is that shareholders place their money at "the risk of the business" while lenders seek a more reliable return. Slappey Drive Ind. Park v. United States,561 F.2d 572, 581 (5th Cir. 1977). The evidence in this case simply does not support the expectation of repayment associated with a valid debt. [21] Accordingly we sustain respondent's determination on this issue. Issue 4 Respondent also determined that Ward Mining's entertainment expenses for the fiscal year ended March 31, 1980, should be reduced to the extent the amount represents payment to the Wards for the *229 use of the "Miss Betty." Respondent contends the boat is an "entertainment facility" within the meaning of section 274, and as such, no deduction otherwise allowable for any expenditure paid or incurred in connection therewith is allowable. Sec. 274(a)(1)(B); sec. 1.274-2(a)(2)(i), Income Tax Regs. Ward Mining does not dispute that expenditures incurred in connection with an entertainment facility are no longer allowed under section 274(a)(1)(B). [22] Instead the corporation contends that its payments represent payments for Mr. Ward's charter services and not payments for rental of the yacht, and therefore should not be considered payments for an entertainment facility. For the reasons stated herein we agree with respondent. Section 274(a)(1)(B) as amended and the legislative history in explanation thereof indicate that Congress intended to preclude deductions for expenditures paid or incurred in connection with an entertainment facility, whether that facility is owned, rented, or used by a taxpayer in conjunction or connection with an entertainment activity. H. Rept. No. 95-1800, *230 95th Cong., 2d Sess. (1978), 1978-3 C.B. 521, 582-515. While a portion of the corporation's payments to Mr. Ward may be attributable to his own services in running the boat and the cost of the deckhand, bait, food and the like, the total charter fee was nonetheless an expenditure paid in connection with the use of a facility which was rented by the corporation to entertain its clients. [23] We hold that the corporation's payments are nondeductible expenditures paid in connection with the use of an entertainment facility. [24] *231 Decision *232 will be entered for respondent.
APPENDIX A DEDUCTIONS
YEAR
INCOME
FIXED EXPENSES
Slip
Depreciation
Insurance
Rental
1979
* 17,298
$22,926 $1,895 $1,323
1980
16,801
17,930
1,895
804
1981
22,660
14,096
1,768
1,300
1982
26,300
8,169
1,100
1983
14,416
7,989
2,609
800
DEDUCTIONS
YEAR
VARIABLE EXPENSES
Deck
Bait &
Hands
Tackle
Fuel
Maint.
1979
$975
$3,361
$4,278
$1,621
1980
2,327
1,754
5,864
3,553
1981
2,215
1,586
6,075
5,630
1982
3,394
2,668
4,442
4,116
1983
1,708
1,587
2,944
4,676
DEDUCTIONS
YEAR
VARIABLE EXPENSES
NET
Dues &
Total
Taxes
Misc.
Publication
Deductions
1979
$21
$10
$36,410 $19,112 (loss)
1980
243
34,370
17,569 (loss)
1981
$15
33
10
32,728
10,068 (loss)
1982
497
1,256
105
25,747
553 (profit)
1983
91
677
23,081
8,665 (loss)
Footnotes
1. Docket Nos. 35071-83 and 35072-83 were consolidated for purposes of trial, briefing, and opinion on November 2, 1984.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Apparently the revenue agent recharacterized as contributed capital the $40,000 loan reported on the corporation's tax return. ↩
4. The report actually states a total of $68,096.61, but when added together the correct total is as reflected. We presume this was an oversight. 5. See n. 4.↩
6. The record does not reflect at what point the Wards or Ward Mining was advised of the change in the tax law.↩
7. On December 26, 1978, Mr. Beaird wrote the following letter to Mr. Ward: Dear Jim: I accept your proposal and appreciate you appointing me representative for the Miss Betty. Your boat should charter well and I will always advise you on reservations by phone. Business will pick up in March and April and I believe I can charter Miss Betty almost every weekend.↩
8. Respondent has not challenged the business use of the boat with respect to Ward Mining. ↩
9. We assume that the charter boat season runs from April through November.↩
10. See Appendix A.↩
11. An "activity not engaged in for profit" is "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Sec. 183(c)↩.
12. These factors are (1) the manner in which the taxpayer carries on an activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.↩
13. See, e.g., Hoffman Bros. Realty Corp. v. Commissioner,T.C. Memo. 1963-320↩. 14. Had not both parties argued the applicability of sec. 183↩ to the facts of this case, we would have been inclined to decide the case using a sham transaction analysis.
15. Cf. McLarney v. Commissioner,T.C. Memo. 1982-461↩. 16. We recognize that Mr. Ward's accountant testified that he felt Mr. Ward was familiar enough with such an undertaking to be able to make an accurate judgment about whether he could be successful. However, we do not find Mr. Ward's "judgment" to be based on anything other than pure speculation. ↩
17. We find it difficult to believe that the boat would have been chartered offshore on each occasion. ↩
18. For example, in 1979 the Wards incurred actual, fixed expenses of $26,144. (See Appendix A.) At the higher offshore charter rate of $350 per day, the Wards would have been required to charter the boat 74.70 days to break even, not including variable expenses such as bait and tackle, fuel, maintenance, and deckhand fees. There are only 69 weekend days from April 1 through November 30. Furthermore, even assuming the boat were chartered the 59 days it was actually chartered, plus the 33 additional week-end days it could have been chartered (in 1979), totaling 92 days, the Wards could not have broken even in 1979. Ninety-two days times $350 per day equals $32,200. The actual fixed and variable expenses for 1979 were $36,410 for 59 days of use. Variable expenses in 1979 averaged $146 per day or approximately $4,800 for 33 days. Thus, 92 days of use would have cost almost $40,000, assuming no increase in maintenance. 19. We recognize that the Wards claim they expected a greater profit margin once Mr. Ward left the mining equipment business and chartered full-time during the fishing season. However, whether Mr. Ward would have done so is mere speculation. We are concerned with the years in issue only, and in fact, Mr. Ward did not charter on a full-time basis in subsequent years due to his inability to retire earlier as planned. Furthermore, we note that the Wards cannot rely on the presumption provided by sec. 183(d)↩ since they showed a profit in only 1 of 5 consecutive years. (See Appendix A.)
20. The Fifth Circuit listed the following factors in Estate of Mixon v. United States,464 F.2d 394, 402 (5th Cir. 1972): (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement.↩
21. Although petitioners urge us to give great weight to the fact that the amounts were repaid, there is nothing in the record to indicate that the corporation had any obligation to do so at the time property and cash were transferred.↩
22. Sec. 274(a)(1)(B)↩ was amended by sec. 361, Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2763, 2847.
23. There is no dispute that the boat is an entertainment facility. See sec. 1.274-2(b)(1)(i), Income Tax Regs.↩
24. The Joint Committee General Explanation appears to indicate that with proper allocation, certain expenses are still allowable after the 1978 amendment: Similarly, the Act does not disallow an otherwise allowable deduction for meal and lodging expenses incurred while away from home overnight. For example, the Act generally does not apply to travel expenses incurred by an individual away from home at a bona fide business, trade, or professional organization meeting or convention. These expenses, however, continue to be subject to the generally applicable rules relating to the deductibility of business travel, convention, and entertainment activity expenses. For example, if a salesman took a customer hunting for a day at a commercial shooting preserve, the expenses of the hunt, (such as hunting rights, dogs, a guide, etc.) would be deductible provided that the current law requirements of substantiation, adequate records, ordinary and necessary, directly related, etc. are met. However, if the hunters stayed overnight at a hunting lodge on the shooting preserve, the cost attributable to the lodging would be nondeductible but expenses for any meals would be deductible if they satisfied the requirements of current law. The shooting preserve should provide the taxpayer with an allocation of charges attributable to the overnight lodging for the taxpayer and guests. [Emphasis added. Staff of the J. Comm. on Taxation, General Explanation of the Revenue Act of 1978, 95th Cong. (1978) (Pub. L. No. 95-600) at 207 (J. Comm. Print 1979.] Arguably, some portion of the charter fee might be analogous to the "expenses of the hunt." However, petitioners have not made such an allocation and we, therefore, express no opinion on the point.↩
*. $303 was from sources other than Ward Mining.↩