T.C. Memo. 1996-68


UNITED STATES TAX COURT


CHARLES A. BALLARD, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 10333-94.                 Filed February 20, 1996.


    B is an S corporation involved in the business of
yacht chartering.  P, the sole shareholder of B,
claimed losses passed through from B.  R disallowed P's
losses on the ground that B's activity was not engaged
in for profit.
    1.  <u>Held</u>:  B's yacht chartering activity was not
engaged in for profit within the meaning of sec. 183,
I.R.C.
    2.  <u>Held</u>, <u>further</u>, sec. 6653(a), I.R.C., addition
to tax is not sustained against P.
    3.  <u>Held</u>, <u>further</u>, sec. 6661, I.R.C., addition to
tax is sustained against P.


<u>James S. Kaplan</u>, for petitioner.

<u>Moira L. Sullivan</u> and <u>Paul T. Muniz</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  By notice of deficiency dated March 17, 1994, respondent determined deficiencies and additions to tax against petitioner as follows:

|  |  | Additions to Tax | | |
|  |  | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(a)(1)(A) | 6653(a)(1)(B) | 6661 |
| 1986 | $32,153 | $1,608 | [1] | --- |
| 1987 | 53,585 | 2,679 | [1] | $13,396 |

[1] 50 percent of interest due on deficiency amount.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by the parties, the issues remaining for decision are:  (1) Whether petitioner may deduct losses incurred by his wholly owned S corporation, Ballard Marine, Inc. (Ballard Marine), in its operation of its yacht chartering business, or whether such deductions are nondeductible because they were incurred in an activity not engaged in for profit within the meaning of section 183(a), and (2) whether petitioner is liable for the additions to tax determined by respondent.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact filed by the parties and attached exhibits are incorporated herein by this reference.

At the time of filing the petition, petitioner resided in Philadelphia, Pennsylvania.

Petitioner

During 1986 and 1987, petitioner was a managing director of an investment banking firm (the firm).  In August 1986, a major portion of the firm was sold and, as a result thereof, petitioner received in excess of $2 million.

Prior to the formation of Ballard Marine, discussed infra, petitioner did not participate in boating for recreation.  He had no experience as a seaman or with the mechanical operation of yachts, and he had very little personal experience in boating. Prior to 1986, he was not a member of any yacht club.

Petitioner became interested in yacht chartering as a result of his activities in arranging entertainment for clients and others connected with the firm.

From late 1985 to the middle of 1986, petitioner visited numerous boat shows.  At those boat shows, vendors described yacht investment plans.

Prior to forming Ballard Marine and causing it to purchase a boat, petitioner did not prepare a formal business plan.  He did consider the economics of the yacht chartering business, as follows:  He planned to spend approximately $250,000 on a boat. He believed that many operating costs (e.g., captain, crew, and fuel) would be paid by the charterer.  He assumed that charterers

would be forthcoming and willing to pay a large enough daily charter fee so that he would break even on his investment with the boat being chartered only 3 to 5 days a month.

Petitioner made his Federal income tax returns for 1986 and 1987 on the basis of a calender year.

Ballard Marine

Ballard Marine, a Maine corporation, was organized on September 2, 1986. The articles of incorporation of Ballard Marine fail to state any purpose for which the corporation was organized. Petitioner was the sole initial director of the corporation. The initial officers of Ballard Marine were a president and a treasurer. Petitioner was appointed to both offices. Ballard Marine elected to be an S corporation within the meaning of section 1361(a). Ballard Marine's election to be an S corporation was effective for its first taxable year. Ballard Marine is a calender year taxpayer.

By contract dated October 17, 1986, Ballard Marine purchased a 49-foot, MY MK III Gulfstar motor yacht (the yacht) for a total contract price of $300,000. Ballard Marine also paid a Florida sales tax of $15,000. Ballard Marine financed $175,000 of the purchase price of the yacht with a bank loan. The yacht was delivered to Ballard Marine on October 23, 1986, in Annapolis, Maryland.

In connection with Ballard Marine's purchase of the yacht, Ballard Marine, or petitioner, consulted with legal counsel.

Ballard Marine hired Walter Schintzius (Schintzius), a yacht broker, for advice on, among other things, the operating characteristics of the yacht, its acceptability as a charter boat, and its residual value.  Schintzius did not advise petitioner on the day-to-day operations or economics of a yacht chartering business.

Ballard Marine obtained insurance against various risks associated with operating the yacht.

On January 26, 1987, the U.S. Coast Guard issued a certificate of documentation with respect to the yacht, which shows that the vessel was then documented for pleasure use.

Florida

In late October 1986, Ballard Marine hired Captain George Newman (Newman), owner of Newman Marine Services (Newman Marine), to move the yacht from Annapolis, Maryland, to the Lighthouse Point Yacht Club (Lighthouse Point), Lighthouse Point, Florida.

In 1987, petitioner purchased land in Lighthouse Point, Florida, on which he eventually built a house for his own use.

Ballard Marine also hired Newman to oversee both the outfitting of the yacht and its maintenance and repair while it was in Florida.  Newman was not engaged in the charter business in 1986 or 1987.

On December 3, 1986, Ballard Marine moved the yacht to the Boca Raton Resort and Club, which is in southern Florida, and which was the site of a meeting of the Securities Industry

Association.  Petitioner attended that meeting.  A colleague of petitioner's from the firm had reserved the yacht for his use on the evening of December 3, 1986.  However, that individual canceled the reservation.

While at the Boca Raton Resort and Club, the yacht was visited by Betty Corson (Corson), a yacht charter agent whom petitioner had known for some time and through whom petitioner had chartered yachts in connection with his employment or his work with the Securities Industries Association.

From December 1986 through April 1987, petitioner contacted other charter agents and several individuals and informed them of the availability of the yacht for charter.  By memorandum dated April 15, 1987, petitioner offered a 25-percent discount on charters to certain colleagues at the firm.  In April 1987, Ballard Marine had printed 3,550 brochures describing the yacht and stating that it was available for charter.  Brochures were sent to Corson and others.

Ballard Marine offered the yacht for bareboat charter. Under that arrangement, the chartering party charters the boat and independently contracts for a captain and crew.  Sometimes the chartering party will be qualified to operate the boat and may not need a captain or crew.  Effective May 1, 1987, the bareboat charter rates for the yacht were as follows:

Bareboat Charter Rates[1]

| | Chesapeake Bay | Florida/Bahamas |
|---|---|---|
| Seven day week[2] (7 days/6 nights) | $3,000 | $3,200 |
| Five day week[2] (5 days/4 nights) | 2,500 | 2,750 |
| Weekends[2] (2 days/1 night) | 1,100 | 1,300 |
| Day Rates[3] | 600 | 700 |
| ½ Day[3] | 400 | 450 |
| Hourly[3] | 175 | 200 |

[1] Excludes cost of fuel, dockage, and stores.
[2] Limited to a party of four.
[3] Limited to a party of six.

Those rates were within 5 to 10 percent of the rates set by Ballard Marine during the preceding 5 or 6 months that it held the yacht out for charter, and those rates were not changed during the remainder of time that Ballard Marine owned the yacht. Petitioner was accorded a discount of 40 percent when he chartered the yacht from Ballard Marine.

On May 13, 1987, an entity named Gulfcoast Farms chartered the yacht for the stated rate of $3,200 a week for a 7-day trip to Key West, Florida.

No other charters were made before the yacht was moved north at the end of May 1987, except that petitioner used the yacht on three occasions. Petitioner was expected to pay for his use of the yacht. Petitioner did not pay for his 1987 use of the yacht until sometime in 1988.

Maryland

On May 24, 1987, Newman moved the yacht from Lighthouse Point to Mears Great Oak Landing, which is in Maryland and on the Chesapeake Bay.  He returned the yacht to Lighthouse Point on October 5, 1987.

Mears Great Oak Landing is 2-1/2-hours travel time, by car, from petitioner's home in Philadelphia.

Petitioner arranged with an individual, David Hart (Hart) to maintain and keep up the yacht while it was at Mears Great Oak Landing.  Hart was to try and obtain charters.  At Mears Great Oak Landing there was a meeting center with approximately 30 rooms and a 9-hole golf course.  The yacht was the only yacht for charter at Mears Great Oak Landing.  The meeting director at Mears Great Oak Landing, and possibly other meeting center personnel, also were asked to try and obtain charters.

Except for use made by petitioner of the yacht, there were no charters of the yacht during the time it was at Mears Great Oak Landing.  Petitioner made substantial use of the yacht on weekends.  Petitioner paid for his use of the yacht in 1988.

Florida

After the yacht was returned to Florida in October 1987, no use of it was made by anyone other than petitioner.

Trade-In of the Yacht and Termination of Charter Business

In January 1988, Ballard Marine disposed of the yacht in a transaction whereby it acquired another boat, a 56-foot Hatteras

flying bridge motor yacht (the second yacht). Ballard Marine agreed to pay $530,000 for the second yacht, but was credited with $300,000 as the trade-in value of the yacht.

Ballard Marine was not successful in chartering the second yacht. Sometime in 1988, Ballard Marine terminated its charter operations.

Books and Records; Ballard Marine's Tax Returns

Petitioner kept records of Ballard Marine's income and expenses on a computer. Petitioner opened a bank account for Ballard Marine. Ballard Marine obtained oil company credit cards in its own name. It dealt in its own name with the power company in Florida. It had its own stationery.

Ballard Marine made returns of income for 1986 and 1987 on Forms 1120S, U.S. Income Tax Return for an S Corporation. On those forms, Ballard Marine reported the following items of income and deduction:

|  | 1986 | 1987 |
|---|---|---|
| Gross income | $ 0 | $13,982 |
| Deductions: |  |  |
| Interest | 2,439 | 16,175 |
| Depreciation | 54,806 | 80,383 |
| Insurance | 3,465 | 3,210 |
| Legal fees | 307 | --- |
| Consulting fees | 5,170 | --- |
| Transport crew/fuel | 5,171 | 18,267 |
| Mooring/ docking | 2,281 | 8,001 |
| Miscellaneous | 50 | 2,865 |
| Telephone & utilities | --- | 1,084 |
| Repairs and maintenance | --- | 10,251 |

| | | |
|---|---|---|
| Advertising and promotion | --- | 4,435 |
| Professional fees | --- | 3,422 |
| Income (loss) | ($73,689) | ($134,111) |

Barry M. Strauss (Strauss), the managing principal of Barry M. Strauss Associates, Ltd. (Associates), is a tax attorney and C.P.A. specializing in advising investment bankers in accounting, tax, and financial matters. Ballard Marine's Federal income tax returns for 1986 and 1987 were prepared by an employee of Associates.

## Petitioner's Tax Returns

Petitioner made returns of income for 1986 and 1987 on Forms 1040, U.S. Individual Income Tax Return. On those forms, petitioner reported losses from Ballard Marine in the amounts of $73,689 and $134,111, respectively.

Petitioner's Federal income tax returns for 1986 and 1987 were prepared by an employee of Associates.

Strauss had come to represent petitioner in 1984, when the firm retained Associates to either prepare or review the tax returns of managing directors to assure that all tax matters were properly reported by them. Associates was so retained in order to avoid having the firm embarrassed either by the Securities and Exchange Commission or the general media on account of the tax problems of managing directors.

## Not an Activity Engaged In for Profit

Ballard Marine's activity of holding the yacht for charter was not an activity engaged in for profit.

Negligence; Substantial Understatement

No portions of petitioner's underpayments for 1986 and 1987 were due to negligence.

The principal purpose of Ballard Marine was not tax avoidance.

OPINION

I. Introduction

Under section 1366, a shareholder in an S corporation is entitled to take into account his or her pro rata share of the corporation's losses. See sec. 1366(a). Ballard Marine was an S corporation for 1986 and 1987, and we must determine the extent of Ballard Marine's allowable losses for those years. Respondent's explanation for her adjustments with respect to those losses is that they were incurred in an activity not entered into for profit. Respondent has also determined additions to tax as set forth above.

II. Deficiencies

A. Section 183--For-Profit Requirement

Section 183(a) provides:

In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

Section 183(c) provides:

For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for

the taxable year under section 162 or under paragraph (1) or (2) of section 212.

The question we must decide is whether Ballard Marine's activity with regard to holding the yacht for charter (the charter activity) constituted an activity "not engaged in for profit".

B.  Actual and Honest Profit Objective

An activity is engaged in for profit if the taxpayer has an "actual and honest objective of making a profit." Keanini v. Commissioner, 94 T.C. 41, 46 (1990).  "Although the section 183 analysis with respect to the activities of a subchapter S corporation is applied at the corporate level, section 1.183- 1(f), Income Tax Regs., * * * [a taxpayer's] intent is attributable to his wholly owned subchapter S corporation." Sousa v. Commissioner, T.C. Memo. 1989-581.  Moreover, although the expectation of profit need not be reasonable, it must be shown that a bona fide profit objective did exist.  Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs.  Profit in this context means economic profit, independent of tax savings.  Hulter v. Commissioner, 91 T.C. 371, 393 (1988).  Whether Ballard Marine engaged in the charter activity with the requisite profit objective is a question of fact to be determined from all the facts and circumstances; petitioner bears the burden of proof.  Rule 142(a); Keanini v.

Commissioner, supra at 46; Golanty v. Commissioner, supra at 426; sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit. No single factor is determinative. Keanini v. Commissioner, supra at 47; Taube v. Commissioner, 88 T.C. 464, 479-480 (1987); sec. 1.183-2(b), Income Tax Regs.

Taking into account the factors set forth in section 1.183-2(b), Income Tax Regs., and based on the record as a whole, we conclude that the charter activity was not an activity entered into for profit, and we have so found.

C. Petitioner Had No Objective To Make a Profit

The regulations provide that "Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity * * * with the objective of making a profit." Sec. 1.183-2(a), Income Tax Regs.

We conclude that, although petitioner certainly would have liked Ballard Marine to make a profit, that was not his objective in organizing and operating Ballard Marine.

In determining petitioner's objective in organizing and operating Ballard Marine, we have the benefit of neither a statement of corporate purpose (in Ballard Marine's articles of incorporation) nor a formal business plan. Nevertheless,

petitioner has made clear his business plan: Buy an asset (a yacht) that he hoped would retain its value and lease (charter) it out for short periods at rates that will quickly return the capital cost of the asset. Indeed, petitioner proposes that we find as facts the following:

> Petitioner was an expert at the Firm in designing investment programs for the short-term utilization of capital assets at lease rates equal to a high percentage of their initial cost. * * *

> Petitioner noted significant similarities between the yacht charter business and these programs in that they both involved assets that retain a high percentage of their initial value, a benefit accruing to the asset's owner.

Petitioner also proposes that we find:

> Petitioner believed that he would have an advantage in obtaining yacht charters because of his contacts with firms in the securities industry, which he knew from his own direct experience were potential frequent users of yacht charters.

Respondent has made various objections to those proposed findings, and we have not made findings of fact in accordance with those proposed findings. The parties have stipulated, however, and we have found, that petitioner had no experience as a seaman or with the mechanical operation of yachts, and he had very little personal experience in boating.

Numerous factors lead us to conclude that petitioner had no objective to make a profit. Petitioner testified that he had calculated the amount of revenue he needed "to break even". He did not testify, however, that he or anyone else determined how

realistic it was to expect Ballard Marine to earn such revenue.

Ballard Marine hired Schintzius, a yacht broker, who advised on the operating characteristics of the yacht, its acceptability as a charter boat, and its residual value. Schintzius, however, did not advise petitioner on the day-to-day operations or economics of a yacht chartering business. Before organizing Ballard Marine, from late 1985 to 1986, petitioner visited numerous boat shows. At those boat shows, vendors described yacht investment plans. We do not doubt that, before forming Ballard Marine, petitioner considered that he might reduce, or even recoup, his cost in purchasing a yacht by holding it out for charter. He knew that there was at least some market for yacht charters. Indeed, he had arranged entertainment for clients of the firm on chartered yachts. We are unconvinced, however, that petitioner's objective in causing Ballard Marine to purchase and operate the yacht was to earn a profit. Did petitioner contemplate the possibility of earning a profit? Yes, we believe that he did, at least in the sense that a profit was possible if (and that is a big if) the value of the yacht would decrease at a rate lower than the rate at which its cost could be recouped out of charter revenues. Although petitioner may have been an expert in certain aspects of commercial transactions that accomplished just that, the insight at the core of both those commercial transactions and petitioner's hopes with regard to the yacht seems to us quite commonplace. We do not equate an objective to make a profit with

the realization (even coupled with the willingness to act on that realization) that, <u>if</u> sufficient revenues could be produced, a profit could be earned. Indeed, petitioner has failed to show us that substantial charter revenue was realistic for Ballard Marine.

Certain trappings of a profit objective are here: Ballard Marine was formed as a business corporation; it had advisers; it kept certain records of its income and expenses; it did offer the yacht out for charter; it did produce advertising brochures; and it did deal with petitioner as an outsider (although at a 40-percent discount). Those trappings, however, are insufficient to convince us of petitioner's objective to earn a profit. Petitioner was the sole shareholder of Ballard Marine, so that Ballard Marine's policy of charging him for his use of the yacht makes little sense except as a for-profit trapping, for tax purposes. Indeed, although petitioner claims on brief that his out-of-pocket costs were "far in excess of any tax benefits", he has failed to detail for us the facts that would prove that conclusion. Clearly, Ballard Marine was unsuccessful in the charter business. Nevertheless, petitioner did not consider a general reduction in prices to try and attract more business.

Finally, we are influenced by the fact that petitioner did make personal use of the yacht. He used it on weekends, when he was free from work. In the winter, he kept it in Florida, at Lighthouse Point, where, in 1987, he purchased land to build a

house.  In the summer, he kept it on the Chesapeake Bay, which is only 2-1/2 hours from his home in Philadelphia.  The tax cost of paying Ballard Marine for his personal use seems to us a small cost for petitioner to have paid if it would have helped him establish the bona fides of a profit objective.  We need not determine what petitioner's objective was in acquiring the yacht (to resolve this case, it is sufficient that we determine only whether it was to earn a profit).  Nevertheless, we believe that petitioner's objective in acquiring the yacht was to have it available for his personal use.  As we have said, we believe that petitioner would have liked to make a profit with the yacht.  Nevertheless, we do not believe that that was his objective in causing Ballard Marine to acquire and operate the yacht.  Cf. Antonides v. Commissioner, 91 T.C. 686, 697 (1988), affd. 893 F.2d 656 (4th Cir. 1990) ("Chartering a yacht to others in order to afford to keep it through tax savings for one's personal enjoyment is not the same as having a profit objective.").

D.  Conclusion

Ballard Marine's activity of holding the yacht for charter was not an activity engaged in for profit within the meaning of section 183(c).  Accordingly, Ballard Marine's expenses attributable to that activity are allowable as deductions only to the extent provided for in section 183(b).

## III. Additions to Tax

### A. Negligence

Respondent has determined additions to tax under section 6653(a)(1)(A) and (B) for both 1986 and 1987. Section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the entire underpayment if any portion of such underpayment is due to negligence. Section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment due to negligence. Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. E.g., Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Petitioner was unable to carry his burden of proving that Ballard Marine had the objective of making a profit. However, the mere fact that petitioner's proof was inadequate does not require us to find that the underpayment with respect to the charter activity was due to negligence. In another recent yacht case, we found no negligence based in part on the passive role of the taxpayer in the decision to engage in the charter activity. Antonides v. Commissioner, supra at 700. Petitioner's role here certainly was not passive. Nevertheless, we find another mitigating circumstance. Both Ballard Marine's and petitioner's returns were prepared by an employee of Barry M. Strauss Associates, Ltd. (Associates). Associates had been retained by

- 19 -

the firm to assure that tax returns of managing directors contained matters properly reported. Barry M. Strauss testified, and we are satisfied, that Associates' personnel were qualified as tax experts, reviewed petitioner's returns, were aware of Ballard Marine's activities, and advised petitioner that his reporting positions were proper.[1] Petitioner can rely on such advice to avoid an addition to tax for negligence. See, e.g., Horn v. Commissioner, 90 T.C. 908, 942 (1988); Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968). Accordingly, we have found that petitioner was not negligent, and we sustain no addition to tax for negligence.

B. Substantial Understatement of Liability

Respondent has determined an addition to tax under section 6661 for 1987. Section 6661(a) provides for an addition to the tax for any year for which there is a substantial understatement of income tax. A substantial understatement is defined as an understatement which exceeds the greater of 10 percent of the tax required to be shown on the return for the year or $5,000. Sec. 6661(b)(1)(A). The amount of the addition to tax is 25 percent of the underpayment attributable to a substantial understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). The amount of the understatement, however, is reduced by amounts attributable

---

[1] That extends to certain adjustments relating to itemized deductions that were the subject of the second stipulation of facts and that were conceded by petitioner.

to items for which (1) there existed substantial authority for the taxpayer's position, or (2) the taxpayer disclosed relevant facts concerning the items with his tax return. Sec. 6661(b)(2)(B).

If, however, the understatement is attributable to a tax shelter, disclosure of the item will not enable the taxpayer to avoid the addition, and the substantial authority test will not apply unless the taxpayer can show that he reasonably believed the treatment causing the understatement was more likely than not proper. Sec. 6661(b)(2)(C)(i). The term "tax shelter" includes an "entity [such as an S corporation] * * * if the principal purpose of such * * * entity * * * is the avoidance or evasion of Federal income tax." Sec. 6661(b)(2)(C)(ii). Section 1.6661-5(b)(iii), Income Tax Regs., interprets the term "tax shelter" as follows:

> The principal purpose of an entity * * * is the avoidance or evasion of Federal income tax if that purpose exceeds any other purpose. * * *

We do not believe that the principal purpose of Ballard Marine was the avoidance of Federal tax, and we have so found. No doubt Ballard Marine facilitated petitioner's tax claim of a profit objective by, among other things, providing him with a way to pay for his own use of the yacht. Nevertheless, we are convinced that petitioner had purposes for forming Ballard Marine, such as limiting his liability, whose importance to him exceeded any tax avoidance purpose. Petitioner's understatement

is not attributable to a tax shelter within the meaning of section 6661(b)(2)(C)(ii).

Petitioner does not claim that adequate disclosure for purposes of section 6661 was made on his or Ballard Marine's return, and, consequently, we do not address that issue.

Petitioner does claim that substantial authority supports his position with regard to the losses from Ballard Marine disallowed under section 183 (the section 183 losses). We must decide whether petitioner's deduction of the section 183 losses is supported by substantial authority. In evaluating whether a taxpayer's position regarding treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions. Sec. 1.6661-3(b)(1), Income Tax Regs. An authority that is materially distinguishable on its facts generally will have little or no relevance in determining whether substantial authority supports the tax treatment at issue. Antonides v. Commissioner, 91 T.C. at 702-704; sec. 1.6661-3(b), Income Tax Regs. Petitioner sets forth five cases as substantial authority: Feldman v. Commissioner, T.C. Memo. 1988-126; Slawek v. Commissioner, T.C. Memo. 1987-438; Zwicky v. Commissioner, T.C. Memo. 1984-471; Dickson v. Commissioner, T.C. Memo. 1983-723; McLarney v. Commissioner, T.C. Memo. 1982-461. All of those cases involve a boat chartering activity and our decision that

the taxpayer entered into the activity for profit. For the most part, we find those cases to involve facts that are materially distinguishable from the facts at hand. In Feldman v Commissioner, supra, the taxpayer purchased a boat with a proven charter record and an established clientele; the taxpayer made no personal use of the boat; he negotiated a favorable management agreement, with a guaranteed minimum level of revenue. In Dickson v. Commissioner, supra, the taxpayer leased the boat to a charter agency for guaranteed annual payments and made limited personal use of the boat. In McLarney v. Commissioner, supra, the taxpayer regularly spent a substantial amount of time and energy running the business; the taxpayer changed the mode of operation to increase profitability; his personal use of the boat was small in comparison to the number of charters. In Zwicky v. Commissioner, supra, the taxpayer devoted substantial amounts of time to the charter operation; the taxpayer engaged in numerous promotional activities to gain charters; the taxpayer made minimal recreational use of the boat. Slawek v. Commissioner, supra, most closely resembles the case at hand in that there we found that (1) the taxpayers made no real investigation of the charter boat business before undertaking their charter activity, and (2) they made no projections of income and expenses as a basis for estimating whether or not the activity could be profitable. We also found, however, that they advertised in a national newspaper, the Wall Street Journal, and that they made

no significant use of the boat for personal purposes.  Even granting that <u>Slawek</u> is relevant, we do not find that there is substantial authority supporting petitioner's position.  The following cases are an example of cases involving facts similar to those at hand, but in which the Court found no profit objective:  <u>Ward v. Commissioner</u>, T.C. Memo. 1987-215; <u>Blake v. Commissioner</u>, T.C. Memo. 1981-579, affd. 697 F.2d 473 (2d Cir. 1982); <u>Lyon v. Commissioner</u>, T.C. Memo. 1977-239.  We find that the authority supporting petitioner's deduction of the section 183 losses is insubstantial.

Petitioner has made no argument with respect to adequate disclosure or substantial authority in connection with those adjustments that petitioner has conceded.  We thus conclude that petitioner concedes that section 6661(b)(2)(B) is inapplicable to those adjustments, and we so find.  Accordingly, we sustain respondent's determination of an addition to tax under section 6661 except to the extent necessary to take account of concessions made by respondent.

<u>Decision will be entered</u>

<u>under Rule 155</u>.