NORMAN R. SOUSA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sousa v. Commissioner
Docket No. 22941-86
United States Tax Court
T.C. Memo 1989-581; 1989 Tax Ct. Memo LEXIS 567; 58 T.C.M. (CCH) 515; T.C.M. (RIA) 89581; October 26, 1989
Daniel E. Goldrick, for the petitioner. Mary P. Hamilton, for the respondent. RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the taxable years 1981 and 1982 in the respective amounts of $ 26,423 and $ 8,303. The issue for decision is whether petitioner's boat chartering activity was engaged in for profit within the meaning of section 183[1] and, if so, whether petitioner is entitled to deduct depreciation claimed in the amounts of $ 14,975 for 1981 and $ 16,025 for 1982 with respect to the boat used in the chartering activity. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated *569 herein by this reference. Petitioner resided in Centerville, Massachusetts when he filed his petition in this case. Petitioner is a cash basis, calendar year taxpayer. During the years in issue, petitioner was president and majority shareholder of Low-Temp Engineering, Inc. (Low-Temp), a company he had organized in approximately 1968. Low-Temp was located at 308 East Main Street, Norton, Massachusetts. The land and buildings where Low-Temp was located were owned by petitioner. Low-Temp engaged in the manufacture and sale of walk-in coolers. Low-Temp's annual sales in 1981 and 1982 were approximately five to six million dollars. Low-Temp paid petitioner wages of $ 114,608 for 1981 and $ 104,988 for 1982 for his services as an executive. During the years in issue, petitioner resided in Hyannis, Massachusetts, where he had resided since approximately 1978. Petitioner has always been interested in boating. He bought his first boat, the Cindy Sue, in 1965, and his second boat, the CinJim, in 1974. The Cindy Sue was a 32-foot long 1954 Chris Craft Express. The CinJim was a 34-foot long 1974 Egg Harbor. Petitioner purchased these boats for pleasure and recreation. On March 8, 1978, petitioner *570 incorporated Cape Cod Charters Inc. of Delaware (Cape Cod Charters) under the laws of the State of Delaware. Petitioner has been the president and sole shareholder of Cape Cod Charters since its organization. On March 30, 1978, Cape Cod Charters elected to be taxed as a small business corporation under subchapter S of the Internal Revenue Code. In April 1978, Cape Cod Charters purchased a new Post Sports Fisherman, 42-foot boat for $ 124,939. Petitioner discussed the purchase price of the boat with his outside accountant for Low-Temp. Petitioner considered other boats, but decided that they were too expensive. The boat was purchased in Connecticut from the Portland Boat Works, but was picked up in Delaware. The boat, the Loran Sea, was equipped to berth six people. Petitioner loaned funds to Cape Cod Charters for the down payment on the Loran Sea, and obtained a mortgage for the balance of the purchase price. There was no expectation that the Loran Sea would appreciate in value. On April 7, 1978, petitioner obtained a license to operate or navigate passenger-carrying vessels. The license ran for five years from the date of issuance. Petitioner hired Wilfred ("Buddy") *571 Precourt as first mate in 1978. Mr. Precourt was an electrician who had worked at Low-Temp during the winter of 1978. Mr. Precourt and petitioner installed electronic equipment and fishing gear on the Loran Sea. Although Mr. Precourt was paid for his services as first mate, he had no expertise in charter fishing. In 1978, the Loran Sea was chartered for bass and blue fishing in the Sandwich Boat Basin on Cape Cod, where the boating season runs from June through September. The price of an eight-hour charter aboard the Loran Sea was set at $ 275, and the price of a half-day charter was set at $ 150. There were approximately 15-20 charters during the 1978 season at Cape Cod. At the end of the season, petitioner and Mr. Precourt took the Loran Sea to Florida. Cape Cod Charters had no charters in Florida. Mr. Precourt returned.to Massachusetts after several weeks in Florida. Petitioner returned to Massachusetts several weeks after Mr. Precourt. Petitioner traveled back to Florida in May 1979 and brought the boat back to Cape Cod. In the summer of 1979, petitioner moved the Loran Sea from the Sandwich Boat Basin to Barnstable Harbor. At Barnstable Harbor, petitioner placed *572 the Loran Sea in the Barnstable Charter Fleet. During the 1979 season at Cape Cod, Cape Cod Charters had approximately 50 charters. In addition to bass and blue fishing, petitioner chartered the boat for tuna tournaments. Low-Temp sometimes chartered the Loran Sea to entertain customers. At the end of the season at Cape Cod, petitioner again took the Loran Sea to Florida where it was chartered only a few times. In 1980, Mr. Precourt left Cape Cod Charters, and petitioner hired a series of new first mates. In 1981 and 1982, Cape Cod Charters had between 12 and 20 charters per year. In 1982, petitioner decided to engage in commercial fishing for tuna fish. On Cape Cod, the tuna fishing season runs from June 30 through September 30, although it may be extended through October if the tuna quota has not been met. On August 5, 1982, a Federal Fisheries Permit was issued to petitioner, allowing him to engage in commercial tuna fishing. It was not until 1983, however, that petitioner began to change his emphasis to tuna fishing, while still doing a small amount of chartering. At first petitioner had little success fishing for tuna. In 1985, petitioner hired a first mate experienced *573 in tuna fishing and became more successful in catching tuna. Cape Cod Charters filed U.S. Small Business Corporation Income Tax Returns (Forms 1120S) for taxable years 1978 through 1985. On its Forms 1120S for 1979 through 1985, Cape Cod Charters listed its address as 308 East Main Street, Norton, Massachusetts, and generally listed its business activity as "fishing charters" and its product or service as "boat rental." No deductions were claimed by Cape Cod Charters for salaries or wages. On its Form 1120S for taxable year 1982, Cape Cod Charters claimed a $ 104 deduction for "Promotion." On its Forms 1120S for taxable years 1978 through 1985, Cape Cod Charters reported the following gross receipts and net income or loss: Taxable Year
Gross Receipts
Amount of Net Income/Loss
1978
(unknown)
($ 12,944) 1979
$ 7,330   (25,660)   1980
14,763    (26,777)   1981
8,753     (20,032)   1982
11,407    (15,206)   1983
5,421     (24,072)   1984
6,821     (26,195)   1985
41,656    5,554      ($ 145,332)
During the period of time that petitioner engaged in his fishing and *574 chartering activity, including the years at issue, he spent most days on the Loran Sea. During that period, he did not work full-time as an employee of Low-Temp. He described his relationship with Low-Temp as being an advisor. He met with the board of directors at Low-Temp a couple of times a month, had meetings with Low-Temp's employees on a monthly basis, and he made decisions on behalf of the company. Petitioner and two other people incorporated another subchapter S corporation, Sail and Dive Charters, from which petitioner showed a loss of $ 9,217 on his 1982 return. Sail and Dive purchased and chartered a sailboat. After two years, this activity was discontinued because it was losing money. On his 1981 Federal income tax return, petitioner reported wages of $ 114,608 from Low-Temp, interest income of $ 1,636, and net rental income of $ 34,600. On his 1982 return, petitioner reported wages of $ 104,988 from Low-Temp, interest income of $ 3,633, and net rental income of $ 27,528. OPINION We must decide whether petitioner's boat chartering activity is an activity not engaged in for profit. *575 Section 183(a) provides that if a taxpayer's activity constitutes an activity "not engaged in for profit," expenses arising out of the activity are allowed as deductions only as provided in section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Section 162 generally permits the deduction of expenses incurred in a trade or business and paragraphs (1) and (2) of section 212 generally permit a similar deduction for expenses incurred "for the production or collection of income" or "for the management, conservation, or maintenance of property held for the production of income * * *." In order to deduct expenses of an activity under either section 162 or 212, a taxpayer must show that he engaged in the activity with an "actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). While *576 a reasonable expectation of profit is unnecessary, a taxpayer's profit objective must be bona fide. Dreicer v. Comissioner, supra at 645. Whether there is an objective to make a profit is a factual issue to be resolved on the basis of all the surrounding facts and circumstances. Finoli v. Commissioner, 86 T.C. 697, 722 (1986). Although the section 183 analysis with respect to the activities of a subchapter S corporation is applied at the corporate level, section 1.183-1(f), Income Tax Regs., petitioner's intent is attributable to his wholly owned subchapter S corporation. See Kartrude v. Commissioner, T.C. Memo. 1988-498; Synnestvedt v. Commissioner, T.C. Memo. 1987-31; Blake v. Commissioner, T.C. Memo. 1981-579. The burden of establishing the requisite profit objective is on petitioner. Beck v. Commissioner, 85 T.C. 557, 569 (1985). We give greater weight to objective facts than to a taxpayer's after-the-fact statements of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), *577 affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs.
Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of nine objective factors relevant to the determination of whether an activity is engaged in for profit. These factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation involved in the activity. Not all of these factors are applicable in every case and no one factor is controlling. Sec. 1.183-2(b), Income Tax Regs. *578 ; Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Allen v. Commissioner, 72 T.C. 28, 34 (1979). Petitioner did not carry on the chartering activity in a businesslike manner. Petitioner sustained large losses for the three years prior to the first year in issue. We believe that petitioner would have reevaluated or redirected the operations of Cape Cod Charters by the beginning of 1981 had his objective been to make a profit. There is nothing to indicate this was done. Petitioner testified that he maintained a separate set of records and a separate checking account for Cape Cod Charters. However, no business records of any kind were introduced into evidence and petitioner testified that he could not recall the name of the bank at which the checking account was maintained. Petitioner also has presented no evidence regarding the extent of Cape Cod Charter's advertising during the years in issue, except that Cape Cod Charters claimed a $ 104 deduction for "Promotion" on its 1982 Form 1120S. Petitioner did not prepare for the activity by either conducting an extensive study of accepted business practices or consulting an expert. The only person *579 he contacted regarding the purchase price of the boat was his outside accountant from Low-Temp, and petitioner has not shown that this individual is an expert in boating or fishing. Petitioner testified, in a vague fashion, that prior to buying the Loran Sea he discussed chartering activities with other people in the business but gave no specifics. His testimony was that he and his accountant projected that if the boat were chartered 250 days a year at $ 275 per charter the activity would be profitable. Petitioner testified that the projection of 250 days of charters per year would depend upon successfully chartering the boat in Florida. Petitioner acknowledged that he knew nothing about chartering in Florida and, as it turned out, the boat was only chartered on a few occasions. Petitioner testified that he spent between seven and ten hours a day on the boat, except when he went to Low-Temp board meetings. "The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational *580 aspects, may indicate an intention to derive a profit." Sec. 1.183-2(b)(3), Income Tax Regs. (Emphasis added.) Although petitioner devoted a substantial amount of time to the chartering activity, the record indicates that he derived a great deal of personal pleasure from fishing and boating. He had a residence in Cape Cod, and he had previously owned boats for pleasure and recreation. We believe that petitioner was engaged in boating and fishing activities for personal enjoyment. It follows that the amount of time he spent involved in the activity is not necessarily indicative of a profit objective. There was no expectation that the boat or other fishing equipment would appreciate in value. There is no evidence that petitioner was successful in carrying on a similar activity. Petitioner was a shareholder of Sail and Dive Charters, a subchapter S corporation which owned a sailboat and engaged in a chartering activity. On the basis of the record before us, we do not consider this to be similar to chartering a deep sea fishing boat or commercial tuna fishing. Petitioner showed a loss on his 1982 return from Sail and Dive Charters. Sail and Dive charters *581 was not profitable, and after two years it was discontinued because it was losing money. In contrast, petitioner continued his involvement with his fishing boat activities despite substantially larger losses over a much longer period. Cape Cod Charters had a history of losses. From 1978 through 1984, Cape Cod Charters had total net losses of over $ 150,000. "A record of such large losses over so many years is persuasive evidence that the petitioner did not expect to make a profit." Golanty v. Commissioner, 72 T.C. 411, 427 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981). Petitioner had substantial income from sources other than his chartering activity. In 1981, petitioner reported wages of $ 114,608, interest income of $ 1,636, and net rental income of $ 34,600. The Cape Cod Charter loss of $ 20,032 offset a portion of his reported income. In 1982, petitioner reported wages of $ 104,988, interest income of $ 3,633, and net rental income of $ 27,528. The Cape Cod Charter loss of $ 15,206 offset a portion of petitioner's reported income. *582 "Substantial income from sources other than the activity (particularly if losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved." Sec. 1.183-2(b)(8), Income Tax Regs.
Petitioner argues that the fact that he changed his emphasis from charter fishing to commercial tuna fishing demonstrates that his objective was to make a profit, particularly in light of the fact that Cape Cod Charters reported a net profit of $ 5,554 in 1985. While under certain circumstances, this might indicate a profit objective, the facts of this case persuade us that petitioner was not engaged in his boat chartering activity for profit. [2] Petitioner started his tuna fishing activities in 1982, but this appears to have been a gradual shift in emphasis that was not completed until 1985 when petitioner hired someone with expertise in this area. It was only after seven consecutive years of generating substantial net losses that Cape Cod Charters generated a net profit. The profitable year, 1985, did not *583 begin until two years after the end of the last year in issue. There is no evidence in the record, and petitioner was not able to recall on cross-examination, whether Cape Cod Charters continued to generate a profit after 1985. Petitioner did not conduct his chartering activity during 1981 and 1982 with a bona fide profit objective. His chartering activity was not a trade or business or an activity entered into for the production of income. Sec. 183(c). [3] Respondent's determinations as set forth in the deficiency notice are sustained. Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. See Akers v. Commissioner, T.C. Memo. 1981-627↩.
3. Because we sustain respondent's determination with respect to profit objective, we need not decide whether the depreciation deductions of Cape Cod Charters should be disallowed on alternative grounds.↩