T.C. Memo. 2002-122


UNITED STATES TAX COURT


JAMES R. AND MYRTICE L. PEACOCK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6111-00.                    Filed May 15, 2002.


<u>Robert N. Reynolds</u> and <u>Ronald Cutler</u>, for petitioners.

<u>Felicia Branch</u> and <u>Benjamin De Luna</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


LARO, <u>Judge</u>:  Petitioners petitioned the Court to redetermine deficiencies in their 1995, 1996, and 1997 Federal income taxes, an addition to their 1997 tax under section 6651(a)(1), and accuracy-related penalties under section 6662(a). Respondent determined for the respective years deficiencies of $132,801, $40,330, and $97,992 and accuracy-related penalties of

$26,560, $8,066, and $19,598. Respondent also determined for 1997 a $24,498 addition to tax under section 6651(a)(1).

Following concessions, we must decide:

1. Whether petitioners' deep-sea tournament fishing activity (fishing activity) was an "activity not engaged in for profit" under section 183. We hold it was.

2. Whether petitioners may deduct a certain bad debt. We hold they may not.

3. Whether petitioners are liable for the accuracy-related penalties and the addition to tax. We hold they are.

Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code. Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded.

## FINDINGS OF FACT[1]

The parties have stipulated some of the facts. We incorporate herein by this reference the parties' stipulation of facts and the exhibits submitted therewith. We find the

---

[1] The Court directed each party to file an opening brief and an answering brief, the latter limited to making any objection to the opposing party's proposed findings of fact. Petitioners have not filed an answering brief. We conclude they have conceded respondent's proposed findings as correct except to the extent that their opening brief contains proposed findings inconsistent therewith. Morgan v. Commissioner, T.C. Memo. 2000-231, affd. 23 Fed. Appx. 813 (9th Cir. 2001); Fankhanel v. Commissioner, T.C. Memo. 1998-403, affd. without published opinion 205 F.3d 1333 (4th Cir. 2000).

stipulated facts accordingly. James R. Peacock (Mr. Peacock) and Myrtice L. Peacock (Ms. Peacock) are husband and wife, and they filed joint Federal income tax returns for the subject years. They resided in Ponce Inlet, Florida, when they filed their petition with the Court.

Mr. Peacock has worked in the automobile industry for approximately 20 years, and he has owned various automobile dealerships. One of those dealerships, Speedway Dodge, Inc., formerly known as Hurley Dodge, Inc. (the dealership), was located on Florida's east coast. In or about 1993, Mr. Peacock spoke to an acquaintance (the acquaintance) living on Florida's west coast about working for the dealership as its general manager. Mr. Peacock persuaded the acquaintance to accept the position by causing the dealership to lend $50,000 to the acquaintance to use as a downpayment on a condominium near the dealership. Mr. Peacock believed that the acquaintance would pay the money back to the dealership when the acquaintance had the money to do so.

In October 1993, Mr. Peacock sold 51 percent of his 100-percent ownership interest in the dealership to spend more time with his wife in an activity, fishing, that they had both enjoyed since their childhood. At or about the time of sale, the acquaintance moved back to Florida's west coast without having made any payments on the loan. When the acquaintance moved back

to Florida's west coast, the acquaintance transferred the condominium to Mr. Peacock subject to a mortgage.[2] Mr. Peacock later sold the condominium but never transferred any of the money to the dealership.

The dealership, an S corporation for Federal income tax purposes, claimed a $50,000 bad debt deduction for 1995 on account of the loan. Respondent disallowed that deduction. On May 18, 1998, the dealership's 51-percent shareholder agreed to the disallowance. At that time, Mr. Peacock continued to own the remaining stock of the dealership.

Petitioners organized Profitable Management Services, Inc. (PMSI), an S corporation, on December 2, 1993. PMSI's president and only shareholder was Ms. Peacock. Both she and Mr. Peacock were paid employees of PMSI. But for services connected with the fishing activity, the only service that Ms. Peacock performed for PMSI was answering its telephones. From 1994 through 1997, PMSI paid the following amounts to petitioners and to its other employees:

| Year | Mr. Peacock | Ms. Peacock | Other employees |
|------|-------------|-------------|-----------------|
| 1994 | -0- | -0- | -0- |
| 1995 | $7,000 | $7,000 | $30,098 |
| 1996 | 26,000 | 19,500 | 72,439 |
| 1997 | 23,000 | 25,500 | [1] |

[1] The record does not disclose this amount.

[2] The record does not disclose either the value of the condominium or the amount of the mortgage.

On its tax return, PMSI reported its principal business activity as providing consultation on automobile dealerships, and, during the relevant years, it had a consulting arrangement with approximately three automobile dealerships. For 1994 through 1997, PMSI's primary activity involved petitioners' participation in numerous deep-sea fishing tournaments (the tournaments). Petitioners decided together after consulting with other members of their tournament team that they and the team would participate in the tournaments through PMSI. Petitioners have fished recreationally since their childhood and began tournament fishing for pleasure sometime in 1988 or 1989.

The tournaments were mostly part of the Billfish (in this case, blue or black marlin) Series, a series of tournaments held throughout the world with contestants representing a wide range of countries. The Billfish Series tournaments generally awarded trophies and cash prizes to the contestants who within an allotted time caught at the tournament one of the four largest billfish and/or the four contestants who within that time caught the most billfish. The total purse of each of the Billfish Series tournaments generally ranged from $100,000 to $2.5 million, and the individual prizes awarded to the contestants generally ranged from $150,000 to $1.2 million. PMSI did not win any cash prizes in 1994 but won two cash prizes in 1997. PMSI won one or two cash prizes in each of 1995 and 1996.

The tournaments were hosted by marinas worldwide in exotic, resortlike places such as the Bahamas, Cabo San Lucas (Mexico), Tahiti, Mauritius, and St. Thomas and presented a social setting that included cocktail parties and dinners, with camaraderie among contestants. Petitioners participated in the tournaments held in the Bahamas, Cabo San Lucas, and St. Thomas, mainly from April through July. Between 25 and 80 teams participated in each tournament, and approximately 15 of those teams, including petitioners' team, participated in the same circuit of tournaments every year.

The tournaments had an atmosphere resembling that of a college spring break and took place in some of the world's most beautiful locations. During the tournaments, the sunny, crystal-clear blue water vacation destinations were the backdrop to sunglassed, beach-attired men and women, five-star restaurants, free-flowing alcoholic beverages, and swarms of revelers consisting mainly of contestants and spectators. The contestants generally fished during the day and danced and celebrated through the night. The celebrations occurred at or near the expensive, posh accommodations where the contestants generally stayed during the tournaments.

Ms. Peacock generally fished at the tournaments from petitioners' luxurious yacht.[3] She was part of a four-person team working together on the yacht to catch and land the desired fish. The team consisted of a captain, two mates, and an angler. The captain remained on the bridge of the yacht during the tournaments, and he was responsible for operating and maintaining the yacht. The angler and the mates worked in the yacht's cockpit. Ms. Peacock was her team's angler, and she was the team's most important member. She was responsible for single-handedly landing each billfish after it had been caught.[4] Mr. Peacock was not a member of the four-person team, but he accompanied the team aboard the yacht during the tournaments and handled the management and financial side of the fishing activity. Each team member's compensation was based primarily on a portion of the team's tournament winnings; i.e., generally, the captain was paid 10 percent of the winnings, the mates were paid 10 percent of the winnings, and petitioners were entitled to keep the rest.

The atmosphere on petitioners' yacht during the tournaments varied from that of a hardworking, dedicated, and skilled group

---

[3] At the tournaments held in Mexico, petitioners chartered a yacht because it was too expensive and hazardous for them to sail their yacht to Mexico through the Panama Canal.

[4] The tournaments' rules provided that only the angler could catch the fish.

of team members to that of a smiling, celebratory group of individuals who shared in the spirit of competition and the pursuit of the team's goal to catch the desired fish.  Sometimes, celebrations aboard the yacht included the consumption of alcohol.  Other times, the captain's wife accompanied him aboard the yacht, and they and petitioners (and possibly other individuals) dined aboard the yacht on fish caught during the day.  Petitioners allowed friends and family members to accompany them aboard the yacht during the tournaments.

Both petitioners are extremely knowledgeable about the techniques of fishing and are experts in catching a desired fish. Petitioners won the 1993 Bahamas Billfish Championship, Ms. Peacock won the 1994 World Billfish Series, and Ms. Peacock placed second in the 1995 World Billfish Series.  Ms. Peacock has caught during her lifetime approximately 75 billfish and has been featured approximately 50 times in various sportfishing magazines.  On one occasion in 1993, Ms. Peacock caught an 885-pound blue marlin which, at that time, was the second largest fish caught in the Bahamas and which, she claims, is displayed at Ripley's Believe It or Not in Niagra Falls, New York.

PMSI reported for the relevant years the following income items, total deductions, and ordinary income (loss):

|                      | 1994 | 1995      | 1996      | 1997 |
|----------------------|------|-----------|-----------|------|
| Tournament winnings  | -0-  | $123,000  | $109,270  | -0-  |
| Consulting fees      | -0-  | 242,997   | 249,200   | -0-  |

| | | | | |
|---|---|---|---|---|
| Trailer park income | -0- | 159,483 | 54,555 | -0- |
| Loss on sale of condo. | -0- | (9,896) | -0- | -0- |
| Loss on sale of land | -0- | -0- | (5,600) | -0- |
| Gross receipts[1] | 337,412 | -0- | -0- | 531,422 |
| Cost of goods sold | -0- | -0- | -0- | (198,809) |
| Total income | 337,412 | 515,584 | 407,425 | 332,613 |
| Total deductions | 314,109 | 820,559 | 655,972 | 330,542 |
| Ordinary income (loss) | 23,303 | (304,975) | (248,547) | 2,071 |

[1] The 1994 gross receipts include $116,135 of income attributable to the fishing activity. (The record does not disclose the specific source of that income.) The 1997 gross receipts include tournament winnings of $117,954.

PMSI's expenses related to the fishing activity's income were as follows:

| Expense | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|
| Tournament fees | $65,645 | $49,375 | $71,975 | $59,350 |
| Boat supplies | 7,010 | 8,079 | 16,451 | 5,946 |
| Tackle & bait | 2,203 | 11,439 | 6,314 | -0- |
| Marina fees | 11,786 | 17,146 | 19,611 | 8,855 |
| Fuel | 14,489 | 14,300 | 32,109 | 16,011 |
| Lodging & travel | 12,623 | 27,407 | 26,359 | 29,380 |
| Contract labor | 7,650 | 6,555 | 725 | 10,236 |
| Professional fees | 54,711 | 24,394 | -0- | -0- |
| Depreciation | 66,277 | 119,298 | 98,139 | 84,616 |
| Insurance | 41,723 | 5,985 | 8,637 | -0- |
| Interest expense | -0- | 42,150 | 33,609 | 25,561 |
| Meals/entertainment | -0- | 3,022 | -0- | -0- |
| Officer compensation | -0- | 7,000 | 19,500 | 25,500 |
| Permits | -0- | 567 | 658 | -0- |
| Salaries | -0- | 9,800 | 39,100 | 66,531 |
| Repairs & maintenance | -0- | 21,746 | 22,727 | 25,030 |
| Taxes | -0- | 2,263 | 4,482 | -0- |
| Charter fees | -0- | 9,814 | 3,615 | 2,500 |
| Miscellaneous | -0- | 13,415 | 12,275 | 7,619 |
| Total | 284,117 | 393,755 | 416,286 | 367,135 |

PMSI's claimed losses from the fishing activity were $168,042 for 1994, $270,755 for 1995, $307,016 for 1996, and $249,181 for 1997. In late 1997, PMSI stopped participating in the

tournaments because Ms. Peacock suffered a knee injury that caused her to decide to discontinue her participation.

PMSI did not prepare a business plan for the fishing activity. Petitioners kept and coded invoices, receipts, canceled checks, and a ledger which was given to their accountant to prepare their and PMSI's annual tax returns. Neither petitioners nor PMSI had a balance sheet, income projection, or other financial statement for the fishing activity until the end of the taxable year, and they were not able to ascertain the fishing activity's financial status for a year until they received the tax returns reporting the activity for that year. Petitioners studied the fishing activity from the point of view of ascertaining the best way that they could catch the desired fish. They did not study the fishing activity from the point of view of catching the fish at a cost that would be less than the anticipated revenues which would be connected therewith.

Petitioners' net worth was at least $1 million in each of the subject years. They had income and cash receipts from activities other than PMSI as follows:

| Source | 1995 | 1996 | 1997 |
|---|---|---|---|
| Interest income | $16,328 | $12,828 | $1,513 |
| Sale of stock | 271 | -0- | 300,000 |
| Interest in the dealership | 171,198 | -0- | -0- |
| Interest in another entity | 72,971 | 90,386 | 114,361 |
| Total | 260,768 | 103,214 | 415,874 |

They also received loan repayments from PMSI of $240,590 in 1995 and $60,815 in 1996.

Petitioners' individual income tax return for 1997 was due on October 15, 1998. The return was prepared in March 1999 and filed on May 13, 1999.

OPINION

A shareholder in an S corporation must take into account his or her pro rata share of the corporation's income or loss. Sec. 1366(a). PMSI is a subchapter S corporation, and Ms. Peacock is its only shareholder. We must determine the extent of PMSI's deductions for its fishing activity that enter into the computation of its income or loss. Respondent denied some of those deductions, determining that the fishing activity was not engaged in for profit. Respondent also determined that petitioners could not deduct the claimed bad debt and that they were liable for the addition to tax and the accuracy-related penalties mentioned above.

Petitioners have not argued that either section 7491(a) or (c) applies to this case. Moreover, the record does not indicate that respondent's examination of the subject years commenced after July 22, 1998. Seeing that section 7491 applies only to court proceedings arising from examinations commencing after July 22, 1998, Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727, we

conclude that neither section 7491(a) nor (c) applies here. Section 7491(a) places the burden of proof upon the Commissioner in specified circumstances. Section 7491(c) places the burden of production upon the Commissioner as to an individual's liability for a penalty or an addition to tax.

1. Fishing Activity

Section 183, which applies to activities engaged in by individuals or S corporations, generally limits the deductions for an "activity not engaged in for profit" to the amount of income received from the activity. Sec. 183(a) and (b). Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."[5] An activity is engaged in for profit if the taxpayer entertained an actual and honest, even though unreasonable or unrealistic, profit objective in engaging in the activity. Osteen v. Commissioner, 62 F.3d 356, 358 (11th Cir. 1995), affg. on this issue T.C. Memo. 1993-519; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.

_____

[5] Sec. 162 deals with "trade or business expenses", which are limited to "ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business". Sec. 212(1) and(2) deals with expenses for the "production or collection of income" or "management, conservation, or maintenance of property held for the production of income".

Petitioners bear the burden of proving that PMSI entered into and remained in the fishing activity with the requisite profit objective.[6]  Rule 142(a)(1); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933); <u>Beck v. Commissioner</u>, 85 T.C. 557, 570 (1985). Section 183 applies at the corporate level with respect to the activities of an S corporation.  Sec. 1.183-1(f), Income Tax Regs.  For that purpose, however, Ms. Peacock's intent is attributable to PMSI, her wholly owned S corporation.  See <u>Eppler v. Commissioner</u>, 58 T.C. 691, 696-699 (1972), affd. without published opinion 486 F.2d 1406 (7th Cir. 1973); <u>Butler v. Commissioner</u>, 36 T.C. 1097 (1961); see also <u>Sousa v. Commissioner</u>, T.C. Memo. 1989-581 (and the cases cited therein).

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors to be considered when ascertaining a taxpayer's intent.  These factors are:  (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional

---

[6] Sec. 183(d) provides a statutory reversal of the burden of proof if petitioners meet specified criteria.  Petitioners do not meet those criteria.

profits, if any; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. All facts and circumstances must be taken into account, and no single factor or mathematical preponderance of factors is determinative. Osteen v. Commissioner, supra at 358; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner, 72 T.C. 28, 34 (1979); sec. 1.183-2(b), Income Tax Regs.

Petitioners rely solely on their testimony to establish all of their proposed findings of disputed facts. As to the issue at hand concerning the fishing activity, petitioners testified that they aimed to earn money from that activity and that they could win millions of dollars in the activity. According to petitioners, PMSI would have reported a profit for each subject year except that two fish got away and one did not. As to the first fish, Mr. Peacock testified that they would have won $300,000 in 1995 had it not got away. Mr. Peacock animatedly described the events surrounding this fish as follows during his direct testimony at trial:

> A. It was in 1995.
>
> Q. And where were you located?
>
> A. Cabo San Lucas, Mexico.
>
>     *     *     *     *     *     *     *
>
> A. So about two or three o'clock, we hook up with this fish and it just takes off running. And Myrtice

gets in the chair and gets strapped down. We get the cockpit clear, meaning you have to take in all other lines, all the teasers, and all the time, this fish is running and taking line. You've got your drag backed all the way off.

The reel has built-in pressure. And that's why you can catch a big fish with 80-pound test is you have to back off and let the fish run and when you realize that he's not running, or whatever, you've got to reel like * * * [crazy] to get that line in, until he starts running again.

This fish takes off and he's running and he jumps and we know it's a 400-pound fish. I mean, we've caught enough fish, we know, you know, we're not going to say a one-pound bass is a five-pound bass. We know what the size is.

An Myrtice works on the fish and works on the fish and works on the fish and we're backing down on the fish and he takes off for his last run and everything went slack. And we said, you know, what * * * happened? Well, when we reel it in, the dead line, the hook, the knot came untied.

As to the second fish, Mr. Peacock testified that petitioners would have won $350,000 in 1996 had it not got away. Ms. Peacock described the events giving rise to that misfortune as follows during her direct testimony at trial:

A. we're fishing. It was a spring day.

THE COURT: What year? * * *

THE WITNESS: '96. There was only a few boats that actually fished out in this area. It was kind of like a little secret type thing. You could catch large fish out there. You might not get a bunch of hits, but, you know, there were large fish.

This other boat radios over and said, You're not going to believe what we just saw. They were cleaning out the refrigerator and threw a bucket of clam chowder over. Well, right in the mess of clam chowder, comes

this humongous blue marlin.  Everybody's kind of
guessing at 1,200 pounds.  I mean, they just worked and
worked and never could get it to back up.

So they radio us to be on the lookout for it and
said, You know, if you find her, you know, you--if
anybody can catch her, you all can.  Because we were
kind of noted for catching large fish.

So we troll around out there for, I'm guessing,
about an hour or so and just, out of the blue, she's
right there at the back of the boat.  I mean, she's
huge.  And everybody's just kind of standing there with
their mouth wide open, looking at this fish that's
right here.  And she is as wide, I mean, as long as the
boat's wide.  And that boat had a 16.3 beam on it.  I
mean, this fish was huge.

So she kind of looks around in the spread.  We've
got a couple of teasers out, both short and long lures
out there.  And she just kind of has to look around.
No big deal.  And then she comes up and spots a bumper.

          *     *     *     *     *     *     *

Q.  * * * describe what it [a bumper] is.

A.  It's normally used to hang off a boat, you
know, on a dock or something.  What we did with them
was, they were painted up with dolphin-type colors.
They were supposed to represent a fish.

Q.  Go ahead.

A.  And it's hanging probably ten, twelve feet off
on I would say a thousand pound leader.  Well, she
just, you know, just casually eats this thing.  So
we're, you know, everybody's going bananas.  And then
she just comes back over and looks at this lure.  And I
guess it was dessert.  That's why I got to calling her
Miss Piggy.

And you know, the reel's singing and we're
just--oh, you want me to stop.  I'm sorry.  I got into
my fish story.

Q.  Well, no.  What happened to Miss Piggy?

A.   We stood there kind of awestruck, you know, not doing anything?

Q.   Was she on your line?

A.   Oh, yes, she was on the line.

Q.   How did she get off your line?

A.   We got in the chair, she's running, you know, we're reeling; we're backing up, and then she starts to jump.  And it was so amazing to see this fish and I quit reeling.

Q.   Did she snap the lines?

A.   Yes, she came down, broke the line, angler error.

As to the third fish, Mr. Peacock testified that petitioners would have won $150,000 in 1997 had it only got away.  Mr. Peacock animatedly described the events surrounding this fish as follows during his direct testimony at trial:

A.   * * * we was in Grey Harbour, which is in the lower part of the Harbour Island, which is in the lower part of the Bahamas.  And we were out, it was either the third or the fourth day of the tournament.  I can't remember which one.

But we was sitting on a 683-pound fish that we knew was going to be a tournament winner.  But the tournament winner is not only predicated on the largest fish, it's the total pound of fish.  It's two separate categories.  The winner is based on pounds of fish.

And there was a boat out of Fort Lauderdale that had caught a fish that morning.  And it wasn't that big a fish.  It was about 300 or so pounds.  And so we're sitting on this 683-pound fish, that we had caught right in the middle of the day.  And we just absolutely knew that we not only had the tournament won, we had the daily won.

So what happens is, there's about 20 minutes to go. And we hear on the radio that this boat is hooked up--

Q. Let me stop you, please. When you say, there's 20 minutes to go, what significance does that have to you?

A. Well, you have a starting time and a finishing time. You can't put the lines in the water--we're already on patrol by tournament headquarters. You can't put the lines in the water until they call you and say, Okay, lines in. And so everybody, at one time, throughout the tournament area, puts their lines in the water. By the same token, at the end of the day, they call the end of the day. And if you show the tape, you will see what happens when we get to the end of the day.

        *     *     *     *     *     *     *

But it was 20 minutes to go in the fishing day. We knew we had it won. If somebody caught a big fish, there was no way that they was going to be able to get it in time to get the lines out of the water, to get to the dock. And, all of a sudden, we hear that this boat, they called in a hook-up. And they said, You know, we got about a 300-, 350-pound fish. And we said, Ah, no problem.

Well, this fish takes off running, as we find out later, when we get to the dock, because ten minutes later, they call in and they say, We got the fish in the boat. And we all say, How * * * did they get that fish in the boat in ten minutes? I mean, that just don't happen with a killable fish.

You can back down on a little fish. I mean, you just run the boat backwards as fast as you got the backbone to run it backwards with the water pouring in on you, but you don't do that with a live fish, because that fish will just run away from you.

How'd they get the fish in that quick? Well, when we get back to the dock, we find out. This fish hooks up, while they're clearing all the lines, don't even start, he takes off running and he's skipping across

the water and runs right into the side of a * * * cruise ship.  Bam!

Takes his bill off, knocks himself out, and he's just kind of floating on top of the water, flopping. They backed down on him, just nice and easy, reach over and get him and put in the boat.  $150,000.  Boom!

Just that easy, because the fish knocked itself out.  They would have never got him in.  We had a 683-pound fish.  That's a * * * fish.  But because of what he had caught that morning and what he caught that afternoon, their combined weight was more than the weight of our fish.

They won the daily and the tournament.  We came in second in the tournament, with a trophy fish, 683 pounds.  All because this cruise ship just happened, * * * it just happened to come by as this fish, who is fearing for his life, is running just as fast as he can, runs into the side of the boat. * * *

We give petitioners' uncorroborated testimony little weight in determining whether PMSI had the requisite profit objective. Petitioners testified that they had a profit objective as to the fishing activity.  Mr. Peacock, in particular, as a successful businessperson, showed some appreciation for making a profit.  In determining whether PMSI's participation in the fishing activity was permeated with the honest and actual profit objective, however, we give greater weight to the nine objective factors set forth above than we do to petitioners' expressions of subjective intent.  Osteen v. Commissioner, 62 F.3d at 358; Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Dreicer v. Commissioner, 78 T.C. at 645; sec. 1.183-2(a), Income Tax Regs.  We turn to those factors and discuss them seriatim.

## i.  Manner in Which the Activity Is Conducted

The fact that a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate records on the activity may indicate that the activity is engaged in for profit.  Sec. 1.183-2(b)(1), Income Tax Regs.  A change in operating procedures, adoption of new techniques, or the abandonment of unprofitable methods may also indicate a profit motive.  Id.

Petitioners argue that this factor weighs in their favor. We disagree.  PMSI neither carried on the fishing activity in a businesslike manner nor maintained complete and accurate records for the activity.  PMSI never set forth a statement of corporate purpose as to the fishing activity in, for example, its articles of incorporation, by-laws, or board minutes.  Nor did PMSI ever prepare a business plan, budget, balance sheet, income projection, or other financial statement.  We also are unable to find that petitioners kept a separate set of books and records on the fishing activity.  Petitioners did keep invoices, receipts, canceled checks, and a ledger on and for the activity. Petitioners, however, never used those records or the data reflected therein to evaluate or improve the fishing activity's financial performance.[7]  Burger v. Commissioner, 809 F.2d 355,

---

[7] In this regard, petitioners are unable to state with any specificity the costs which they incurred in each tournament and

(continued...)

359 (7th Cir. 1987), affg. T.C. Memo. 1985-523; <u>Connolly v. Commissioner</u>, T.C. Memo. 1994-218, affd. without published opinion 58 F.3d 637 (5th Cir. 1995). Nor did petitioners ever undertake a meaningful effort to make the fishing activity more profitable. Mr. Peacock is an accomplished and successful businessperson who for many years has been directly involved with the requirements of business, including the need to keep complete and accurate records. As an individual who had the skills necessary to make his automobile dealerships profitable and successful, we believe that he was, or should have been, sufficiently familiar with business practices to allow him to conduct the fishing activity in a manner evidencing a profit objective had he had one. Instead, the manner in which he and Ms. Peacock fished at the tournaments suggests that they were participating in the tournaments recreationally. See <u>Connolly v. Commissioner</u>, <u>supra</u>. This factor favors respondent.

### ii. Petitioners' Expertise

A taxpayer's expertise, research, and study of an activity, as well as his or her consultation with experts, may be indicative of a profit intent. Sec. 1.183-2(b)(2), Income Tax Regs.

---

[7](...continued)
the amount of money that could be won there.

Petitioners argue that this factor weighs heavily in their favor. We disagree. Although petitioners studied tournament fishing and competitions from the point of view of a contestant, and were very good fishers at that, they never undertook a basic investigation of the factors that affected the profitability of the fishing activity. See Underwood v. Commissioner, T.C. Memo. 1989-625. Petitioners were aware of the large cash prizes which could be won at the tournaments and believed that they could win many of those prizes because their skills were superior to those of other contestants. Petitioners, however, never seriously studied tournament fishing from a businessperson's point of view; e.g., they never researched or solicited advice on the magnitude of expenses which they were likely to incur in attempting to win the prizes. In fact, we are unable to find in the record that petitioners ever performed any meaningful economic study on the profit potential of tournament fishing.[8] See Vallette v. Commissioner, T.C. Memo. 1996-285. Petitioners' expertise and experience in fishing is counterweighed by their lack of knowledge on the economics of tournament fishing. This factor is neutral.

---

[8] By contrast, petitioners did solicit advice on the best way to catch the desired fish and hired a seasoned crew to help reach that goal. The fact that they solicited such advice and hired the crew, but never requested advice on the economics of the fishing activity, reinforces our conclusion that petitioners' participation in the fishing activity was recreational.

iii.  Time and Effort Spent Conducting the Activity

The fact that a taxpayer devotes much of his or her personal time to an activity may indicate a profit intent, especially where the activity does not involve substantial personal or recreational aspects.  Also, a taxpayer's withdrawal from another occupation to devote his or her time and effort to an activity may indicate a profit motive.  Burleson v. Commissioner, T.C. Memo. 1983-570; sec. 1.183-2(b)(3), Income Tax Regs.

Petitioners argue that this factor weighs in their favor. We disagree.  Although petitioners devoted their time to the activity during the tournaments, they spent only approximately 3 months of the year on that activity.  Moreover, not all of that time was devoted to the fishing activity.  The record reveals that contestants at the tournaments spent much of their time frolicking and reveling with family and friends, and we are unable to find in the record credible evidence that would indicate that such was not the case with petitioners.  We also note that Mr. Peacock's stated reason for leaving the automobile industry in 1993 was to spend more time with his wife rather than to devote his time to another business.  This factor is neutral.

iv.  Expectation That Assets Will Appreciate in Value

"Profit" encompasses appreciation in the value of assets. Sec. 1.183-2(b)(4), Income Tax Regs.  Therefore, in evaluating a taxpayer's intent, we also look to the taxpayer's expectation

that the assets used in an activity may appreciate in value. The potential for asset appreciation is usually associated with land and other tangible assets.

Petitioners make no argument as to this factor. Nor have they offered any evidence that indicates that any assets used in the fishing activity would appreciate in value. This factor favors respondent.

### v. Taxpayer's Success in Similar or Dissimilar Activities

Although an activity is unprofitable, the fact that a taxpayer has previously converted similar activities from unprofitable to profitable enterprises may show a profit intent with respect thereto. Sec. 1.183-2(b)(5), Income Tax Regs.

Petitioners argue that this factor weighs in their favor. We disagree. Although Mr. Peacock has been a successful entrepreneur in the automobile industry, the record does not reveal that his work in that industry had any bearing on petitioners' ability to conduct PMSI's fishing activity profitably. Moreover, the record reveals that petitioners conducted the fishing activity as a means to participate jointly in a recreational and social pursuit. In fact, PMSI terminated the activity when Ms. Peacock was no longer able to participate in it. This factor favors respondent.

vi.  An Activity's History of Income and/or Losses

A series of losses beyond the startup stage may be indicative of the absence of a profit motive unless the losses can be blamed on unforeseen or fortuitous circumstances beyond the taxpayer's control.  Sec. 1.183-2(b)(6), Income Tax Regs.

Petitioners argue that this factor weighs in their favor. We disagree.  Notwithstanding that their tournament winnings totaled almost $500,000 in 1994 through 1997, PMSI reported losses from the fishing activity of $168,042 for 1994, $270,755 for 1995, $307,016 for 1996, and $249,181 for 1997.  In total, PMSI incurred almost $1.5 million of expenses to win approximately $500,000, producing an approximate loss of $1 million.  The record, moreover, contains no credible evidence to suggest that PMSI ever expected to recoup any of these losses. The fact that the fishing activity suffered losses year after year and that petitioners took no meaningful action to reverse the tide supports a finding that they were indifferent as to whether the losing trend could be reversed.  Ranciato v. Commissioner, 52 F.3d 23, 25-26 (2d Cir. 1995), vacating T.C. Memo. 1993-536.  Although it is true that petitioners aspired in the tournaments to win large cash prizes, the mere fact that they so aspired and were qualified to win those prizes does not mean that PMSI entered into the fishing activity with the requisite profit objective.  This factor favors respondent.

vii. Amounts of Occasional Profits

Occasional profits may indicate a profit motive. The absence of profits, however, is not determinative of a lack of profit motive. Petitioners need only have an actual and honest profit objective. Absent actual profits generated from the activity, an opportunity to earn a substantial ultimate profit in a highly speculative venture may be sufficient to indicate that the activity is engaged in for profit. Sec. 1.183-2(b)(7), Income Tax Regs. "Profit" means economic profit independent of tax consequences. Antonides v. Commissioner, 91 T.C. 686, 693-694 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Dreicer v. Commissioner, 78 T.C. at 644-645.

The fishing activity has never earned a profit, and petitioners have not persuaded us that PMSI had a chance either to make a profit or to recoup their losses. Whereas petitioners testified that the nonoccurrence of three misfortunes would have resulted in PMSI's reporting a profit for each subject year, we are unpersuaded that such would have been the case. Among other things, we are unpersuaded that petitioners would have won the claimed amounts of money had the misfortunes not occurred. The record lacks any objective evidence to establish the specific prizes which petitioners would have won had those misfortunes not occurred, or the net amount of those prizes which would have

ultimately been realized by PMSI.[9]  This factor favors
respondent.

### viii.  Taxpayer's Financial Status

Substantial income from sources other than the activity
(particularly if the losses from the activity generate
substantial tax benefits) may indicate that the activity is not
engaged in for profit.  This is especially true where there are
personal or recreational elements involved.  Sec. 1.183-2(b)(9),
Income Tax Regs.

Petitioners argue that this factor weighs in their favor.
We disagree.  Petitioners had substantial income and cash
receipts from activities other than PMSI, and their net worth
exceeded $1 million.  Petitioners' financial status allowed them
to finance the fishing activity and to use the activity's losses
to reduce significantly their income tax liability.  To be sure,
but for those losses, PMSI would have reported (and Ms. Peacock
would have been required to recognize) large amounts of ordinary
income in each subject year.  By participating in the fishing
activity, however, petitioners aim to reduce their income while,
at the same time, participating jointly in an expensive activity

---

[9] We find as a fact that the Billfish Series tournaments
awarded individual contestants prizes generally ranging from
$150,000 to $2 million.  We are unable to find, however, the
amount of the specific prizes which were paid by the tournaments
in which petitioners participated.  Nor are we able to find the
specific prizes payable by the tournaments in which the
misfortunes occurred.

that they both enjoy with a subsidy from the fisc.  This factor favors respondent.

### ix.  Elements of Personal Pleasure

Although the mere fact that a taxpayer derives personal pleasure from a particular activity does not mean that he or she lacks a profit intent with respect thereto, the presence of personal motives may indicate that the activity is not engaged in for profit.  This is especially true where there are recreational elements involved.  Id.  "[T]he fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors".  Id.

Petitioners argue that this factor weighs in their favor. We disagree.  Petitioners began tournament fishing for pleasure sometime in the late 1980s and focused their participation in tournaments on ones held in exotic, resortlike locations. Although a taxpayer's participation in a tournament fishing activity may sometimes qualify as an activity engaged in for profit, e.g., Busbee v. Commissioner, T.C. Memo. 2000-182, such is not the case here.  Petitioners' pursuit of competitive excellence was not motivated primarily by the pursuit of profit. On the basis of our evaluation of the record as a whole, including our viewing of an approximately 1-hour video on the

1994 World Billfish Series, a segment of which was devoted to petitioners and their team, we conclude that petitioners participated in the tournaments for pleasure and recreation rather than the pursuit of business.  This factor favors respondent.

### x.  Conclusion

On the basis of our careful review of the record and our evaluation of the nine aforementioned factors, we conclude that PMSI did not engage in the fishing activity with an actual and honest objective of making a profit.  We sustain respondent's determination.

## 2.  Bad Debt

Respondent determined that petitioners were not entitled to the claimed bad debt deduction.  Petitioners assert that the dealership could deduct the $50,000 loan in 1995 as a bad debt because the loan was never repaid.  Petitioners assert that the condominium when Mr. Peacock received it was worth less than the balance on the loan and that Mr. Peacock reported on his personal income tax return the proceeds which he received when he later sold the condominium.

Section 166(a)(1) allows a deduction for any debt that becomes worthless within the taxable year.  A nonbusiness bad debt is deductible only in the year it becomes totally worthless.  A deduction is not allowed for partial worthlessness.  Black v.

Commissioner, 52 T.C. 147, 151 (1969). To qualify for a bad debt deduction, a taxpayer must show that "some event occurred during the year in which the deduction is sought that rendered the debt uncollectible." Greenberg v. Commissioner, T.C. Memo. 1992-292.

The law and the facts do not support petitioners' claim to this bad debt deduction. Among other things, petitioners have not proven: (1) That the amount of the loan was uncollectible from the acquaintance or (2) that the equity in the condominium which Mr. Peacock received did not exceed the loan balance. We sustain respondent's denial of this deduction.

## 3. Accuracy-Related Penalties and Addition to Tax

Respondent determined that petitioners are liable for accuracy-related penalties under section 6662(a) for, among other things, negligence and intentional disregard of rules or regulations. Petitioners argue that they reasonably believed that the fishing activity was a business and that they reasonably relied upon their tax return as prepared by their accountant.

Section 6662(a) and (b)(1) imposes a 20-percent accuracy-related penalty on the portion of an underpayment that is due to negligence or intentional disregard of rules or regulations. Negligence includes a failure to attempt reasonably to comply with the Code. Sec. 6662(c). Disregard includes a careless, reckless, or intentional disregard. Id. An underpayment is not attributable to negligence or disregard to

the extent that the taxpayer shows that the underpayment is due to the taxpayer's having reasonable cause and acting in good faith. Secs. 1.6662-3(a), 1.6664-4(a), Income Tax Regs.

Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item. United States v. Boyle, 469 U.S. 241 (1985); see also Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 98 (2000). The good faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. United States v. Boyle, supra; sec. 1.6664-4(b), Income Tax Regs. Whether a taxpayer relies on advice and whether such reliance is reasonable hinge on the facts and circumstances of the case and the law applicable thereto. Sec. 1.6664-4(c)(1)(i), Income Tax Regs. The taxpayer must prove that: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Ellwest Stereo Theatres, Inc. v. Commissioner, T.C. Memo. 1995-610; see also Rule 142(a)(1).

We are unable to conclude that petitioners have met their burden of proof as to this issue. First, we are unable to find that petitioners reasonably believed that the fishing activity was actually a business. Mr. Peacock, a successful

businessperson, knew, or at least should have known, that the manner in which he conducted the fishing activity was dramatically different from the manner in which he conducted his automobile ventures. Nor do we believe that petitioners can escape the reach of the accuracy-related penalties by asserting baldly that they relied reasonably upon their accountant. Petitioners never called their accountant to testify as to the preparation of any of the returns. Petitioners also never attempted to meet any of the requirements of the Ellwest test. We sustain respondent's determination of the accuracy-related penalties under section 6662(a).

As to respondent's determination under section 6651(a), petitioners are liable for that addition to tax unless they prove that their failure to file the 1997 Federal income tax return timely was: (1) Due to reasonable cause and (2) not due to willful neglect. Sec. 6651(a)(1); Rule 142(a)(1); United States v. Boyle, supra at 245. A failure to file timely a Federal income tax return is due to reasonable cause if the taxpayer exercised ordinary business care and prudence and, nevertheless, was unable to file his or her return within the prescribed time. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Willful neglect means a conscious, intentional failure or reckless indifference. United States v. Boyle, supra at 245.

Once again, petitioners have presented no persuasive evidence on this issue, and the record does not otherwise establish that their failure to file timely returns was due to reasonable cause and not due to willful neglect. In this regard, we find unpersuasive petitioners' claim that they should be relieved of the addition to tax because their new accountant for 1997 was unable to timely receive information from the former accountant as to the basis of certain stock that they sold. We see no reason why the return was not filed timely. We sustain respondent's determination under section 6651(a).

All arguments made by petitioners but not discussed herein have been considered and have been found to be without merit. Accordingly,

<u>Decision will be entered under Rule 155</u>.